Per Curiam:
This case was referred to Trial Commissioner C. Murray Bernhardt, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on January 20, 1966. Plaintiff filed exceptions to certain of the commissioner’s findings of fact and defendant filed exceptions to the opinion and recommended conclusion of law. The case was submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion, findings and recommen *939 dation of tbe commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Therefore, plaintiff is entitled to recover and judgment will be entered for plaintiff with the amount of recovery to be determined pursuant to Rule 47(c). Defendant is not entitled to recover on its counterclaim and the counterclaim is dismissed.
Commissioner Bernhardt’s opinion,* as modified by the court, is as follows:
After 17 years of praiseworthy enlisted service on active duty in the Marine Corps,[1] in 1958 the plaintiff accepted perforce an undesirable discharge in lieu of a threatened court-martial and possible imprisonment on morals charges.[2] In this action to recover pay and allowances accruing since the discharge he relies on its illegality in that it was procured on the threat of a court-martial if he refused to sign a confession exacted under alleged duress, when unbeknown to him but known to his Navy inquisitors no corroborative evidence existed in fact of his confessed offense with which to suffice a court-martial conviction. He charges with factual error the finding of the Navy Discharge Review Board, following a hearing, that sufficient evidence existed to warrant trial by court-martial, and with arbitrary and capricious action the refusal of the Board for Correction of Naval Records to correct his discharge, which was done without a requested hearing. The precise issue thus framed is not whether an uncorroborated confession of homosexual acts will *940 ground an undesirable discharge, but whether such a discharge is valid which rests solely on a confession procured on threat of a court-martial which could not have succeeded because of the absence of corroborative evidence.
The plaintiff’s first knowledge of his implication in charges of homosexuality occurred on July 23, 1958, when he was summarily brought before two special agents of the Office of Naval Intelligence and told by them that they wished to interrogate him as to reports of his participation in homosexual conduct with an unknown male person in a men’s toilet at the Pentagon on March 11,1958. He was duly warned of his statutory rights against self-incrimination, etc., under the Uniform Code of Military Justice (10 U.S.C. 831). After initial denials of guilt the plaintiff orally admitted certain acts. The admissions followed the showing to plaintiff of a photograph of an unidentified man in a compromising situation in a toilet stall allegedly in the same men’s room at the Pentagon where the plaintiff had been accused of being seen in -flagrante delicto, thus planting in plaintiff’s mind the prospect that concealed cameras making a photographic record of his own actions would make denials of his misconduct useless. This, coupled with his natural panic and the representation by the agents that by making a written confession he might be permitted to resign rather than be court-martialed, or possibly get a medical discharge, or even (more remotely) be retained on active duty, induced the plaintiff to prepare in his own handwriting and sign a statement composed at the prompting of the agents, which confessed his passive participation in specific misbehavior. Five days later he orally confirmed to the same agent the accuracy of the written statement, since recanted.
At the time of the interrogation on July 23,1958, the special agents should have known, and undoubtedly did know, that in actual fact the Navy had no way of corroborating by independent evidence the facts admitted by plaintiff in his confession. No written statements by witnesses to the admitted violations had been obtained, as section 4b of SecNav Instruction 1620.1, June 5, 1953, requires. Nor, as was later learned, were there known eyewitnesses to the alleged acts. *941 This absence of corroborative evidence was not known to plaintiff at the time of his interrogation, nor in the course of his subsequent applications to the Navy Discharge Review Board and the Board for Correction of Naval Records, for the reason that in those proceedings plaintiff had no access to the classified records of the Navy investigation, although his counsel had endeavored with only partial success to get at such records in the Correction Board proceeding. It was not until the plaintiff invoked the discovery procedures of this court that he learned for the first time the names of the particular operatives who supposedly had the damning eyewitness evidence against him, and then discovered in the course of their testimony at trial that not only had they not personally witnessed the alleged actions but were unable even to identify plaintiff himself as a person they could remember having seen ever before. Whether they would have been able to identify plaintiff in 1958 cannot be determined, but it is relatively clear that neither of these operatives ever saw the plaintiff in a compromising homosexual situation, and at most could have known of it only by hearsay since their assignments with respect to the toilet surveillance were merely to follow suspects from the toilet at the direction of other operatives posted to observe the acts themselves. One of the ONI special agents who initially interrogated the plaintiff on July 23,1958, candidly admitted in his testimony before the court that it was “very shoddy investigative work”, and that he had undertaken the assignment to interrogate plaintiff reluctantly at the insistence of his superior, to whom he complained in effect: “What the hell do you want me to do with this piece of junk [the memorandum reciting facts of plaintiff’s misconduct] ? I don’t have an official contributor, and I don’t know who did this, and I would prefer to do some investigative work to find out more.” He was not permitted to perform his own investigation and proceeded unwillingly to interrogate plaintiff and procure his confession largely on bluff, succeeding more on the weakness of the plaintiff’s resistance than on the strength of the provable facts against him.
*942 The quality of the investigation hardly comports with the direction in SecNav Instruction 1620.1 that reports of homosexual activities shall be inquired into “thoroughly and comprehensively” in order to “ascertain all the facts and circumstances of the case”, or that “It is essential that all of the facts indicating homosexual tendencies or acts be properly recorded and that signed statements of all witnesses be obtained.” Nor does it measure up to the requirements of Article 32, Uniform Code of Military Justice (10 U.S.C. 832) for a “thorough and impartial investigation”.
“In testing the validity of a discharge given by an armed service, one of the prime questions is whether the department complied with its own regulations. * * * We have several times held that a discharge issued in violation of regulations is a nullity. [Citations]. Not merely the character of the discharge but the fact of discharge is voided by the failure to accord the serviceman his material rights or to follow the required procedures. [Citations].” Middleton v. United States, 110 Ct. Cl. 36, 39-40 (1965). There the plaintiff had admitted in writing his passive participation in an uncompleted homosexual act. After conviction by a civilian police court, followed by acquittal on appeal, he signed a form statement agreeing to accept an undesirable discharge “for the good of the service and to escape trial by general court-martial.” [3] He was thereafter separated with an undesirable discharge, later changed to a general discharge for unsuitability at the direction of the Secretary of the Navy following a Correction Board’s unaccepted recommendation for an honorable discharge. The court held that plaintiff’s less than honorable discharge had been obtained improperly in that SecNav Instruction 5810.1 barred court-martial trials against individuals who had been convicted or acquitted of the same acts in a state court, except in unusual cases where the Secretary of the Navy considers court-martial “essential in the interests of justice, discipline, and proper administration within the naval service.” The parallel to the case under consideration is that the “Navy investigators and officials *943 affirmatively led him [Middleton] to believe that be would be court-martialed if be did not acquiesce in tbe undesirable discharge.”, but was not told of tbe tecbnical provision in tbe SecNav Instruction which would have virtually precluded a court-martial trial. Similarly, the instant plaintiff was misinformed by being threatened with a court-martial if be did not agree to accept an undesirable discharge, without being told that his confession was not sufficient for trial by court-martial in the absence of (nonexisting) corroborating evidence.
The essentiality of corroborating evidence in such cases is made clear by the Manual for Courts-Martial, United States, 1951. Thus, section 25 of Chapter VI, dealing with the preparation of charges, states:
Ordinarily, charges for an offense should not be preferred against an individual if, after investigation, the only available evidence that the offense was committed is his statement that he committed it. In rare cases, however, it may be advisable to prefer charges prior to the completion of an investigation made pursuant to such a statement, as, for example, when the statute of limitations may run before all contemplated witnesses can be interrogated.
The present case is not within the excepted class of “rare cases” referred to in this citation, for there was ample time for a thorough investigation to have been completed prior to the serving of charges on plaintiff. Further, section 140 in Chapter XXVII of the Manual for Courts-Martial, relating to Rules of Evidence, reads at page 251:
An accused cannot legally be convicted upon his uncorroborated confession or admission. A court may not consider the confession or admission of an accused as evidence against him unless there is in the record other evidence, either direct or circumstantial, that the offense charged had probably been committed by someone. * * * The corroborating evidence need not be sufficient of itself to convince beyond a reasonable doubt that the offense charged has been committed, and it need not tend to connect the accused with the offense.
We are not concerned here with the quality of the corroborating evidence available to support the plaintiff’s confession; *944 the problem is ratlier a total lack of corroborating evidence, clearly contrary to tbe plain words of the Manual.
The defendant places some reliance on Grant v. United States, 162 Ct. Cl. 600 (1963), but a reading of the case demonstrates its inapplicability. The Grant case involved the issuance of a general discharge for an act of sodomy with a female prostitute rather than an undesirable discharge for a homosexual offense as here, and the Grant opinion stated affirmatively that SecNav Instruction 1620.1 did not apply, but it does here. Moreover, Grant did not involve the acceptance of a less-than-honorable discharge which was procured by improper threats of a court-martial or by other improper misrepresentations.
It is not remarkable that plaintiff agreed to accept an undesirable discharge rather than a court-martial when one considers the inferior assistance he received from the Naval officer appointed to be his counsel. The counsel, a nonlawyer whose qualifications and experience do not appear in the record but may be judged from the caliber of his representation of plaintiff, was engaged on the spur of the moment at the very time and place the plaintiff was served with charges on August 14,1958. He was present in the room and agreed to represent plaintiff as counsel at the suggestion of the officer who served charges on the plaintiff, and with the plaintiff’s consent, for he was not financially able to engage private counsel. Within a matter of minutes counsel urged upon plaintiff the course he adopted, namely, to sign a form statement agreeing to accept an undesirable discharge for the good of the service and to escape trial by general court-martial. Quite obviously plaintiff’s counsel was woefully unfamiliar with the facts of the case, for in the brief period from his hiring to his advising the plaintiff to sign away his rights he would scarcely have had time to do more than examine the charges and the meager investigative file in plaintiff’s case, much less perform an adequate investigation of the facts so as to insure the plaintiff proper representation. It is highly unlikely that plaintiff’s counsel thus engaged was familiar enough with military law to have appreciated the fact that the Manual for Courts-Martial required corroborative evidence to support a confession, even *945 if he had ascertained that there was no corroborative evidence to support plaintiff’s confession, for otherwise he would have sought time within which to ascertain what corroborative evidence existed. We do not have the benefit of this counsel’s testimony, for due to an oversight in his instructions he failed to appear as a witness for the defendant in the trial before this court, although scheduled to do so.
Application of Stapley, 246 F. Supp. 316 (1965), is instructive on the subject of what is expected of a counsel in special courts-martial, and the quality of advice given the present plaintiff, plus the paucity of his visible efforts in plaintiff’s behalf, lead easily to the conclusion that plaintiff’s counsel was about as beneficial to him as was inept counsel in the Stapley case, which there led to Stapley’s discharge from military confinement on a writ of habeas corpus. The present plaintiff’s less-than-honorable discharge may be attributed to his less-than-adequate military representation.
Events moved swiftly for plaintiff. On July 24,1958, the day following his confession, he submitted to a polygraph (lie-detector) test. He was reinterrogated on July 28 and confirmed his confession. On August 14 he underwent a psychiatric examination, with a resulting recommendation that he be considered a Class II homosexual and processed administratively accordingly (see footnote 2). On August 14 he was served with charges, engaged counsel, and signed the statement agreeing to an undesirable discharge to escape court-martial. The following day, August 15, the accusing officer in the court-martial charges recommended to plaintiff’s commanding officer his undesirable discharge as a Class II homosexual. The commanding officer concurred in the recommendation the same day in a first indorsement to the Commandant of the Marine Corps. On August 18 a board of three officers set up under § 10277 of the Marine Corps Manual concurred in the discharge recommendation. The Marine Corps Commandant on August 25 directed plaintiff’s commanding officer to issue plaintiff an undesirable discharge, and on September 5 the plaintiff was separated. Forty-four days of processing had elapsed, and there is no indication in the record that consideration had been given to a want of corroborating evidence.
*946 The plaintiff applied immediately, September 29,1958, to the Navy Discharge Review Board, where he was represented by a staffman from the American Legion in a hearing accorded him January 7, 1959. The Discharge Review Board found that the investigation “disclosed sufficient evidence of his involvement to warrant trial by General Court-Martial”, a finding sharply at variance with the facts as we now know them to be. There is reason to believe that the Discharge Review Board was aware of the lack of corroborating evidence at least constructively, but gave no thought to the legal significance of such lack in court-martial proceedings. Nor was this deficiency cured by the Correction Board to which the plaintiff applied in November 1960. Plaintiff’s civilian counsel in that proceeding demanded the Navy’s classified files of the investigation, and received his confession in full and an edited summary of information, but not the names of the eyewitnesses to the offense, which was what he needed. The Board did furnish for plaintiff’s use a statement from the Navy that in the event of trial by court-martial they would have produced as witnesses the two ONI Special Agents to prove the voluntary nature of the confession they had procured from plaintiff. Nothing was said about producing any other witnesses to corroborate the facts in the confession, such as the operatives who purportedly witnessed the offense, and it is permissible to interpret this failure to mean that the Navy was well aware that it had no evidence to corroborate independently the facts stated in plaintiff’s confession. In April 1962 the Correction Board sent plaintiff a standard form letter rejecting his application.
There is no difficulty in finding the Discharge Review Board in error in holding that the evidence before it would have warranted plaintiff’s trial by court-martial. For the same basic reasons the Correction Board’s action was, if not arbitrary and capricious as plaintiff alleged, at least not supported by substantial evidence now known to exist.
The plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 47(c). The defendant is not entitled *947 to judgment on its counterclaim for the proportionate part of plaintiff’s reenlistment bonus allocable to that part of Ms last enlistment period not served.
FINDINGS oe Fact
1. Period of service. Plaintiff served in the United States Marine Corps as an enlisted man on active duty from August 22, 1941 to September 5, 1958, when he received an undesirable discharge while serving in the grade of Technical Sergeant. During his military career he had spent 22 months overseas in World War II, participated in the Iwo Jima campaign, served three months in 1950 as a combat cameraman in Korea where he engaged in the Inchon landing and the Naktong Eiver operations, and was awarded four Good Conduct medals and three Presidential Unit Citations.
2. Pentagon morals investigation. In 1958 Pentagon policemen employed by the General Services Administration collaborated with agents of the Criminal Investigation Division of the Army in investigating reports of homosexual activities occurring in a men’s toilet in the Pentagon designated as Eoom No. 2D167. Six or seven agents maintained a surveillance of the site by peeking through cracks between the stall-doors and the supporting jams, peering under and over the top of the stalls, and by concealing themselves in the ceiling crawl space from winch vantage point a photograpMc record was made of some of the activities below. Agents were stationed outside of and in the immediate vicinity of the toilet entrance for the purpose of following and securing the identification of suspects leaving the toilet.
S. Investigation of plaintiff. On July 11, 1958, the Commanding Officer, Headquarters Battalion, Headquarters, U.S. Marine Corps, Washington, D.C., requested the investigative assistance of the District Intelligence Office, Potomac Eiver Naval Command, “to inquire into the possible homosexual activity” of the plaintiff. Walter E. Bruce, then a special agent with the Office of Naval Intelligence, was assigned by Ms superior to investigate certain information contained in a memorandum concermng alleged perversion occurring in *948 tbe toilet referred to in the previous finding involving two men, one of them a Marine who had been followed out to a parting lot and into a car bearing license plates said to correspond to license plates issued to plaintiff. The memorandum containing this information was unusual in that it was not an investigator’s report or an official document, was not accompanied by supporting documents, and was not signed. It originated with the Army Criminal Investigation Division and, in agent Bruce’s opinion, represented “very shoddy investigative work” because of its incompleteness, informality, lack of authorship identification, and lack of identification of all persons involved in the alleged perverted acts. Agent Bruce undertook the assignment reluctantly at the insistence of his superior, asking the latter in effect: “What the hell do you want me to do with this piece of junk ? I don’t have an official contributor, and I don’t know who did this, and I would prefer to do some investigative work to find out more.” Bruce’s instructions from his superior were merely to interview the plaintiff, who he said had been identified and observed in the commission of perverted acts on or about March 11,1958.
4. Interrogation of plaintiff. On July 23, 1958, by prearrangement, plaintiff was picked up at his barracks by a military truck and taken to the Naval Gun Factory to be interviewed by Special Agent Bruce of the Office of Naval Intelligence. There the plaintiff was interviewed for approximately three or four hours by Special Agents Bruce and James. After being formally advised by Bruce that he need not answer any questions and that anything he said might be used against him at a court-martial, plaintiff was asked questions concerning reports of his participation in homosexual activities occurring in a men’s toilet at the Pentagon, which activities the plaintiff initially denied. After being shown by Bruce a photograph of an anonymous individual in a compromising position in a toilet stall which established that one could in fact be observed under such normally private conditions, the plaintiff made certain admissions, the nature of which is in dispute. Bruce’s version of the admissions made by plaintiff, which corresponds to the contents of a written confession which plaintiff signed, was that on two *949 occasions while plaintiff was sitting in a toilet stall in the men’s toilet in question, an unknown man in the adjoining stall had reached under the partition separating the stalls and felt his leg and, proceeding further, had performed an indecent act on the plaintiff with his passive cooperation. At trial the plaintiff’s version of his admission to Bruce was that on each of two occasions an unidentified man in the adjoining stall had borrowed a book of matches from him, and then returned the matches under the partition with a note suggesting in effect that plaintiff go for a ride in the unknown man’s car, but that there had been no other overt acts and that plaintiff had either told the unknown man to “get lost” or had ignored the advance, if such it was. Whatever the nature of the actual admission, it is likely to have been induced to an important degree by the photograph shown plaintiff by Bruce, which would have naturally led plaintiff to suspect the possibility of there being a similar photographic record of his own activities which it would have been difficult to refute. No such pictures existed. For reasons given in the accompanying opinion it is unnecessary to resolve the dispute as to the exact nature of the admissions made by plaintiff to the two special agents. Nor is 'it necessary to resolve the disputed truth of plaintiff’s testimony that Bruce threatened him with being locked up for the night and subsequent court-martial and lengthy imprisonment if he did not make a written confession, or the alleged promise by Bruce that making such a written confession would not only save plaintiff these results but might also lead to a mere transfer of plaintiff to another base instead of a forced resignation and undesirable discharge. Bruce testified that he had informed plaintiff that if he made a written confession he might be allowed to resign rather than be court-martialed, or that he might get a medical discharge, or that there was a remote chance of his being retained on active duty.
5. The confession. At the conclusion of the interrogation on July 28, 1958, as described in the preceding finding, the plaintiff wrote and signed a six-page statement in his own handwriting. During its preparation either Bruce or James, and sometimes both of them, were present and advising plaintiff as to portions of its contents. Both of them witnessed the *950 plaintiff’s signature to the statement. Certain parts of the statement, such as the opening and closing paragraphs, relating to formal warning of his rights not to talk, etc., under Article 31 of the Uniform Code of Military Justice, and as to the absence of threats and promises, and the initialing of changes, were copied by plaintiff from prepared forms given him by the agents. Other parts of the statement providing information as to plaintiff’s place of birth, family, education, and duty assignments, were written and composed by plaintiff; at the prompting of the agents who apparently suggested the information which they wished the statement to contain. The vital and incriminating part of the statement occurs in the third paragraph, wherein the plaintiff described in somewhat greater detail his degree of participation in the acts referred to in finding 4. This section was composed and written by plaintiff, and there is no proof of plaintiff’s contention that it was dictated to him by the agents, although they must necessarily have told plaintiff that he would have to describe the facts .¡relating to the offense. Finally, the statement expresses repentance and remorse, and provides by way of extenuation a reason for his actions relating to his wife’s temporary indisposition at the time.
6. Duress. During his interrogation on July 23,1958, and the writing of the statement described in the preceding finding 5, the plaintiff was very nervous, but rational. If he was in a “state of duress” as he testified to have been, it was not due to any proven coercion on the part of special agents Bruce and James who conducted the interview, nor was it due to anything other than a natural distress and trepidation on plaintiff’s part over the investigation and its potential consequences.
7. Lie-detector test. On July 24,1958, the plaintiff voluntarily submitted to examination by polygraph, commonly referred to as a “lie detector”. The polygraph operator rendered his opinion to the Navy that the plaintiff “did attempt deception in answering” certain questions.
8. Reinterrogation of plaintiff. On July 28,1958, plaintiff was reinterrbgated by Special Agent Bruce, and said he had nothing further to add to his statement of July 23, 1958, which he maintained was the truth.
*951 9. Psychiatric examination. On August 14, 1958, a Navy psychiatrist examined plaintiff and reported that he was “clear, coherent, oriented, and cooperative, but anxious and gravely distressed by his present situation.” He recommended that plaintiff would be considered a homosexual Class II according to Secretary of the Navy Instruction 1620.1, and should be processed administratively accordingly.
10. 0owrt-martial charges; election for undesirable discharge. On or about August 14, 1958, plaintiff was served with a charge sheet containing two specifications for violations of the Uniform Code of Military Justice, Article 134, charging him in one count with the commission of an “indecent, lewd and lascivious act with a white male person”, name unknown, in a specified manner, and in the second count with the reciprocal commission of the same offense in mutual cooperation with an unknown male. The official accuser named in the charge, Lieutenant J. K. McDonald, served the charge sheet on plaintiff in the presence of a Captain Treble who, at Lieutenant McDonald’s suggestion and with plaintiff’s approval, agreed to serve as plaintiff’s counsel, since plaintiff had stated that he was financially unable to engage counsel. Captain Treble conferred briefly with plaintiff, left the conference room temporarily, and then returned to advise plaintiff to accept an undesirable discharge as the only way out. There is some confusion as to the details of Captain Treble’s discussion with the plaintiff. The account reported here is the plaintiff’s version. Captain Treble failed to appear as defendant’s witness at the scheduled trial because of an oversight in the Office of the Navy Judge Advocate General. Before the Navy Discharge Review Board (finding 13, infra) the plaintiff testified that he thought he had told Captain Treble that he wanted medical care if he was guilty of the charges. On the advice of Captain Treble the plaintiff then signed a statement prepared by Captain Treble in which the plaintiff agreed to “accept an undesirable discharge for the good of the service and to escape trial by general court-martial”. The record does not indicate that Captain Treble, who was not a lawyer, made any independent investigation whatsoever of the case. The *952 brevity of his deliberation prior to rendering advice to plaintiff as counsel justifies the belief that he could have done no more than examine the charges and the report of investigation. Treble advised plaintiff that by signing the statement agreeing to take an undesirable discharge the plaintiff might improve his chances of receiving consideration. The following day, August 15,1958, Captain Treble informed plaintiff’s wife, whom plaintiff had summoned to Washington, that the plaintiff was guilty and that nothing could be done about it in view of the statement signed by plaintiff. Again, this is the plaintiff’s unrefuted version of the discussion with Captain Treble who, as stated above, did not appear for trial through a mistake in instructions.
11. Clemency request. On August 15,1958, at the suggestion of Captain Treble, plaintiff filed a summary of his praiseworthy military experience and a separate signed statement in which he stated, in part, as follows:
I will not attempt to rationalize or offer excuses for my actions except to state briefly why or how it happened, I do not know or understand.
*****
I realize the Marine Corps cannot permit me to continue my intended career and this in itself is extremely difficult to visualize, but I respectfully request clemency, not for myself but for my wife and two (2) young boys. Even without the forthcoming effects of an early discharge I have suffered as only a man can who knows he has violated the rules of society. I have begged forgiveness from God for my weakness and I pray that the board will consider my past record and my future usefulness as a citizen.
12. Undesirable discharge. On August 15,1958, Lieutenant McDonald, the accusing officer who had served the charges on plaintiff the previous day, recommended to his commanding officer by letter that plaintiff was a homosexual within the meaning of Class II, SecNav Instruction 1620.1, and that he be discharged from the service in accordance with Paragraph 10217, Marine Corps Manual. The cited Instruction defines Class II homosexuals as “those cases wherein personnel, while in the naval service, have engaged in one or more homosexual acts or where evidence supports proposal or attempt to perform an act of homosexuality, and which do not *953 fall in the category of Class I [aggressive or dangerous homosexuality involving some form of force or coercion of another person].” The cited Paragraph 10277 of the Marine Corps Manual authorizes discharge for reason of unfitness of enlisted personnel, where the unfitness consists of habits or traits of character manifested by enumerated forms of conduct, one of which is homosexuality. On August 15, 1958, plaintiff’s commanding officer concurred with the findings and recommendations of Lieutenant McDonald in a first endorsement to the Commandant of the Marine Corps. On August 18, 1958, a board of three officers concurred in the recommendation for plaintiff’s undesirable discharge by reason of unfitness, citing plaintiff’s passive participation in two homosexual acts committed with unidentified males. On August 25, 1958, the Commandant of the Marine Corps directed plaintiff’s commanding officer to issue plaintiff an undesirable discharge. On September 5, 1958, plaintiff was discharged from the Marine Corps with an undesirable discharge.
13. Discharge review board. On September 29, 1958, the plaintiff applied to the Navy Discharge Review Board to be reinstated in the Marine Corps. On January 7,1959, the Navy Discharge Review Board conducted a hearing in plaintiff’s case. Plaintiff was represented by a staff employee of the American Legion and testified before the Board. The Board concluded “that the character of the discharge was proper. No evidence was adduced which would warrant any change therein.”, and that the investigation “disclosed sufficient evidence of his involvement to warrant trial by General Court Martial.” The Board had in its record for consideration the investigating report of the Office of Naval Intelligence. This report was not made available to plaintiff, nor is there any indication that plaintiff or his counsel asked the Board for permission to examine the said investigating report. The Secretary of the Navy reviewed and approved the Board’s proceedings 'and final action, of which the plaintiff was notified on March 17, 1959. On April 15, 1959, the plaintiff wrote to the Board inquiring why he was not granted a more favorable decision, and saying that he was “framed” and in a state of duress after questioning. The Board replied on May 1,1959, offering to reconsider the *954 case only if plaintiff bad new, material and relevant evidence.
14. Correction Board.
(a) On November 22, 1960, plaintiff made application to the Board for Correction of Naval Records to show that he was not discharged from the Marine Corps on September 5, 1958, and that application was made for transfer to the Meet Marine Reserve to become effective February 17, 1961. A hearing was requested.
(b) Plaintiff was represented before the Correction Board by private counsel who represents him before this court. Plaintiff’s counsel requested the Correction Board to obtain and make available to him for review any classified information in the Navy records relating to the plaintiff’s discharge proceedings. On March 14,1961, the Correction Board transmitted this request to the Director of Naval Intelligence, asking that a summary or extract of classified files be prepared for plaintiff’s use if the files themselves could not be made available under the law and regulations. On March 17, 1961, the Office of Naval Intelligence supplied the Correction Board with a copy of plaintiff’s written statement of July 23, 1958 (the “confession” described in finding 5, supra), and a summary of information regarding the plaintiff dated March 18, 1961, which documents were furnished plaintiff’s counsel by the Correction Board, in addition to plaintiff’s statement of August 14,1958, agreeing to accept an undesirable discharge in lieu of a general court-martial, as referred to hi finding 10, supra.
(c) The summary of information furnished plaintiff’s counsel by the Correction Board recited that the Naval Intelligence Office received information that plaintiff had been observed on March 11, 1958, engaged in committing specified perverted acts, that he had been identified as driving a specified car, and that plaintiff had signed a statement admitting the acts and had subsequently verified the truth of the statement.
(d) On April 4,1961, after having examined the material which had been furnished him by the Correction Board, plaintiff’s counsel requested the Correction Board for the names of witnesses which the Navy was prepared to call in the event of a court-martial “to corroborate the ‘confession’, *955 or any other competent evidence that the ONI was prepared to present.” He also asked for a copy of the lie-detector material resulting from the plaintiff’s polygraph examination.
(e) On April 13,1961, the Correction Board advised plaintiff’s counsel that, if plaintiff had been tried by court-martial and the voluntariness of his written confession had become an issue, the Government could have called special agents Bruce and James who had originally interrogated plaintiff and had witnessed plaintiff’s statement of July 23, 1958. Plaintiff’s counsel was also given a copy of five questions and plaintiff’s answers thereto in the course of the polygraph examination, and the polygraph operator’s opinion that plaintiff had attempted deception in answering the questions, but the polygraph material itself was not given plaintiff’s counsel.
(f) On May 5,1961, plaintiff’s counsel wrote to the Correction Board requesting permission to confer with special agents Bruce and James, and for copies of the lie-detector tapes and questions. This request was transmitted to the Director of Naval Intelligence, who on June 1,1961, advised the Correction Board that he would not make special agents Bruce and James available to plaintiff’s counsel for interview, nor would he furnish the charts of the lie-detector tests because they would not have been admissible evidence at trial. A renewed effort by plaintiff’s counsel for advice as to what special agents Bruce and James would have testified to in the event of a court-martial met with the Correction Board’s reply that they would have testified as to the voluntariness of plaintiff’s “confession”.
(g) On April 18, 1962, the Correction Board advised plaintiff in writing that his application was denied without a hearing, stating that the material submitted by plaintiff in support of his application did not establish a sufficient basis for a hearing, and proffering to review the case if plaintiff advanced additional material evidence showing that an error or injustice had occurred. Plaintiff made no further representations to the Correction Board.
15. Corroborative evidence.
(a) After the filing of the instant petition the plaintiff filed a motion for call on the Navy which requested, inter *956 alia, the names and locations of any persons having knowledge of facts corroborating the acts set forth in plaintiff’s confession, and documentary evidence of a corroborative nature. In response to the motion, and over defendant’s objection, a call was issued and there was deposited with the court by the Navy a letter accompanied by a Naval Intelligence Investigation Report, dated July 31, 1958. The Investigation report referred to information having been received from “Confidential Informant A-l, of known reliability” that plaintiff had been observed on March 11, 1958 performing certain perverted acts which were described, and which formed the basis of the plaintiff’s ultimate undesirable discharge. The letter from the Navy revealed to the plaintiff for the first time that the only eyewitnesses to plaintiff’s alleged acts were Mr. Michael Bartko, a General Services Administration Guard, and Mr. Anthony J. Zibura, an enlisted man with the Army Intelligence Division. Messrs. Bartko and Zibura participated in the surveillance of the toilet room at the Pentagon as described in finding 2, sufra.
(b) When Bartko testified as a witness at trial in this court, he was unable to identify the plaintiff (who was present in the courtroom) as a person he had ever seen before or whom he had seen engaged in the commission of a homosexual act in the Pentagon toilet. Nor was plaintiff’s name included in a list of suspects contained in Bartko’s logbook reflecting his surveillance activities at the said toilet. He recalls having followed a uniformed man, probably a marine, from the toilet in question at the request of Army agents, then turned the “tail” over to another unnamed agent who, according to the Navy report, followed the suspect to a car bearing plaintiff’s license tag number. When Zibura testified as a witness at trial in this court, he was shown several photographs of plaintiff and was unable to identify him as anyone he had ever seen before, but could not say positively that he had or had not seen the man in the photographs engaged in homosexual acts in the Pentagon toilet, because “This has been a long time ago.” He never personally saw any homosexual acts committed in the said toilet, because he was stationed outside the toilet to follow particular individuals emerging from the toilet.
*957 16. Oownterolaim. Defendant’s counterclaim filed in this case on November 6, 1962, asks for judgment against plaintiff in the amount of $325.76, together with interest thereon. A Certificate of Indebtedness issued by the General Accounting Office, dated August 28,1962, notified the plaintiff in pertinent part as follows:
You reenlisted in the United States Marine Corps, service No. 321 654, January 20,1957, for four years and received a reenlistment bonus of $665.60. You were discharged on September 5, 1958, as a result of misconduct. You did not serve 2 years, 4 months and 14 days under your reenlistment contract.
Section 208(f) of the Career Compensation Act of 1949, as added by section 2 of the act of July 16, 1954, 68 Stat. 488 (37 U.S.C. 239(f)), and Paragraph 044070 Navy Comptroller Manual, issued pursuant thereto, require that any person to whom a reenlistment bonus is paid and who voluntarily or as a result of his own misconduct, does not complete the term of enlistment, shall refund a pro rata portion of the bonus paid.
A statement of your indebtedness is as follows:
Time not served for which reenlistment bonus is to be recouped—
2 years, 4 months and 14 days, or 28 and 14/30 months:
Computation of amount for recoupment:
~48 mos>=$13'866 Per month
X28 and 14/30=$394. 73
LESS: Pay due at date of discharge 68. 97
325.76
CONCLUSION OE LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover on his claim and that defendant is not entitled to recover on its counterclaim, which is dismissed, and judgment is entered to that effect, with the determination of the amount of recovery to be reserved for further proceedings under Rule 47(c).

The opinion, findings of fact, and recommended conclusion of law are submitted under tbe order of reference and Rule 57(a).

 Including 22 months overseas in World War II, participating in the Iwo Jima campaign, three months in 1950 as a combat cameraman in Korea participating in the Inchon landing and Naktong River operations, award of four Good Conduct medals and three Presidential unit Citations.

 There are five types of discharge for enlited Marines: honorable, general, undesirable, bad-conduct, and dishonorable. The first three are given by administrative action; the last two are given only by court-martial action. Of the ten formal reasons for discharge, one is unfitness. Marine Corps Manual 1949, §§ 10250, 10251. unfitness as a ground for administrative discharge consists, inter alia, of evidence of habits or traits of character manifested by enumerated forms of conduct, one of which is homosexuality. Discharge actions for unfitness involving homosexuality must be referred to the Commandant of the Marine Corps for decision. Id., § 10277. Plaintiff’s discharge was for unfitness as a Class II homosexual, which is defined in SeeNav Instruction 1620.1 as one who has engaged in an actual or attempted homosexual act not falling in Class I (aggressive or dangerous types).

 The “boiler-plate” form of statement prescribed by SecNav Instruction 1620.1, para. 5, and identical to that signed by the instant plaintiff.